# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| GLORIADEAN JEANNETTE LANCASTER, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. CIV-15-154-STE ) |
| CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration, | ) ) ) ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Gloriadean Jeannette Lancaster brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of the Social Security Administration denying her application for benefits under the Social Security Act. The Commissioner has answered and filed a transcript of the administrative record (hereinafter TR. ____). The parties have consented to jurisdiction over this matter by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

The parties have briefed their positions, and the matter is now at issue. Based on the Court's review of the record and the issues presented, the Court **REVERSES** the Commissioner's decision and **REMANDS** the matter for further administrative proceedings.

### I. PROCEDURAL BACKGROUND

Plaintiff's application for disability insurance benefits was denied initially and on reconsideration. Following a hearing, an Administrative Law Judge (ALJ) issued an

unfavorable decision. (TR. 22-34). The Appeals Council denied Plaintiff's request for review. (TR. 1-3). Thus, the decision of the ALJ became the final decision of the Commissioner.

## II. THE ADMINISTRATIVE DECISION

The ALJ followed the five-step sequential evaluation process required by agency regulations. *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); 20 C.F.R. § 416.920. At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since November 17, 2011, the application date. (TR. 24). At step two, the ALJ determined that Plaintiff had severe impairments of status post fracture of right humerus, status post January 2010 surgery; osteoarthritis; obesity; learning disability; depression; below average intellectual functioning; anxiety; and post-traumatic stress disorder. (TR. 24). At step three, the ALJ found that Plaintiff's impairments did not meet or medically equal any of the presumptively disabling impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1 (TR. 25).

At step four, the ALJ found Plaintiff had the residual functional capacity (RFC) to:

> [P]erform less than the full range of "light work," as defined at 20 CFR 416.967(b), except that claimant can only: occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; never climb ropes, ladders, or scaffolds; perform no work over head; below overhead level, frequently, but not constantly, use her right arm for reaching, handling, fingering, and feeling; understand, remember, and carry out simple, routine, repetitive tasks; make only simple work related decisions; deal with only occasional changes in work processes and environment; have no contact with the general public; have only incidental, superficial work-related type contact with co-workers and supervisors, i.e., brief, cursory, succinct communication relevant to the job being performed; cannot perform any fast pace type work (i.e., no high production standard); and

require the claimant to perform no reading, writing, or mathematics beyond the 6th grade level.

(TR. 29).

Based on the finding that Ms. Lancaster could not perform her past relevant work, the ALJ proceeded to step five. (TR. 32). There, he asked a vocational expert (VE) whether any jobs existed that Plaintiff could perform with the above-listed RFC limitations. (TR. 60). Given the limitations, the VE identified three jobs from the Dictionary of Occupational Titles (DOT). (TR. 61). The ALJ adopted the testimony of the VE and concluded that Ms. Lancaster was not disabled based on her ability to perform the identified jobs. (TR. 34).

### III.  ISSUES PRESENTED

Plaintiff alleges error at step three in the consideration of Listing 12.05(C). The Court agrees and orders reversal and remand for further analysis at step three.

### IV.  STANDARD OF REVIEW

This Court reviews the Commissioner's final decision "to determin[e] whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied." *Wilson v. Astrue*, 602 F.3d 1136, 1140 (10th Cir. 2010). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted).

While the court considers whether the ALJ followed the applicable rules of law in weighing particular types of evidence in disability cases, the court does not reweigh the

evidence or substitute its own judgment for that of the Commissioner. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (quotations and citations omitted).

## V. ERROR AT STEP THREE

As alleged by Ms. Lancaster, the ALJ committed legal error at step three in his consideration of Listing 12.05(C).

### A. Criteria at Step Three

At step three, the ALJ must determine whether the claimant's impairment is "equivalent to one of a number of listed impairments that the Secretary acknowledged as so severe as to preclude substantial gainful activity." *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). If this standard is met, the claimant is considered *per se* disabled. *Knipe v. Heckler*, 755 F.2d 141, 146 (10th Cir. 1985). The question of whether a claimant meets or equals a listed impairment is strictly a medical determination. *Ellison v. Sullivan*, 929 F.2d 534, 536 (10th Cir. 1990); 20 C.F.R. §§ 416.925(c)(3)-(4), 416.926(b). The claimant has the burden at step three of demonstrating, through medical evidence, that her impairments "meet *all* of the specified medical criteria" contained in a particular listing. *Sullivan v. Zebley*, 493 U.S. at 530 (emphasis in original). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.*

Once the claimant has produced such evidence, the burden is on the ALJ to identify and discuss any relevant listings. *Id.* at 733, n.3. In doing so, the ALJ must weigh the evidence and make specific findings to support the step three determination. *Clifton v. Chater*, 79 F.3d at 1009.

**B.    Listing 12.05(C)**

Listing 12.05(C) sets forth the requirements to determine whether an individual with an intellectual disability[1] is presumptively disabled. To satisfy Listing 12.05, "a claimant must meet[] the requirements of that listing's capsule definition [as well] as one of the four severity prongs for mental retardation as listed in the regulations." *Wall v. Astrue*, 561 F.3d 1048, 1062 (10th Cir. 2009) (internal quotation marks omitted).

The capsule definition for Listing 12.05 states:

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.,* the evidence demonstrates or supports onset of the impairment before age 22.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05 (Listing 12.05). And the "severity" prong for Listing 12.05(C) requires: "A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05(C) (Listing 12.05(C)).

**C.    Error in the Consideration of Listing 12.05(C)**

At step three, the ALJ concluded that Plaintiff had not satisfied Listing 12.05(C) because she had not satisfied the requisite severity prong. (TR. 28). The ALJ stated:

---

[1]  Prior to August 1, 2013, courts and medical practitioners referred to "mental retardation" instead of "intellectual disability." On August 1, 2013, the SSA changed Listing 12.05 from "mental retardation" to "intellectual disability." Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 Fed. Reg. 46,499, 46, 499 (Aug. 1, 2013). Based on the timing of various diagnoses and case law referenced herein, the Court deems the terms interchangeable for purposes of this opinion.

5

> [T]he "paragraph C" criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

(TR. 28). Beyond this statement, the ALJ failed to explain his findings and he did not discuss the capsule definition of Listing 12.05 at step three. (TR. 25-28).

Despite these findings, contrary evidence of a qualifying IQ score and Plaintiff's severe impairments at step two provide conclusive evidence that Ms. Lancaster had met Listing 12.05(C)'s severity prong. On February 27, 2012, Dr. Mark Englander performed a consultative examination on Plaintiff and administered the Wechsler Adult Intelligence Scale–III (WAIS–III). Tests results revealed full scale and verbal IQs of 69 and 70, respectively, and Dr. Englander diagnosed Plaintiff with mild mental retardation. (TR. 297). The scores create a presumption that Ms. Lancaster met the IQ requirement for Listing 12.05(C). *See Peck v. Barnhart*, 214 Appx. 730, 2006 WL 3775866, at 3 (10th Cir. Dec. 26, 2006) (unpublished op.) (noting that at "full scale score of 70 under the WAIS-III . . . [met] the valid IQ score requirement for Listing 12.05(C)). And at step two, the ALJ's finding of severe impairments satisfy the requirement for "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *See id.* at 3-4 (noting that "severe" impairments at step two satisfy the "significant limitation of function" portion of Listing 12.05(C)); 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00 (stating that a "severe" impairment as defined in 20 C.F.R. § 416.920(c) will be found to impose an "additional and significant work-related limitation of function" as set forth in Listing 12.05(C)).

At step three, the ALJ committed legal error by not discussing the IQ scores or Dr. Englander's diagnosis of mild mental retardation. (TR. 28). The Commissioner apparently concedes the error as she agrees that Ms. Lancaster met the severity prong for Listing 12.05(C). (ECF 26:7). But as discussed, Ms. Lancaster had to meet *all* of the criteria in Listing 12.05(C) to be considered presumptively disabled. In addition to the severity prong, Plaintiff had to meet Listing 12.05(C)'s capsule definition which requires a showing of "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period." Listing 12.05. The ALJ committed legal error by failing to discuss and explain his apparent rejection of the capsule definition at step three. (TR. 28); *Clifton v. Chater*, 79 F.3d at 1009 (requiring the ALJ to "discuss the evidence and explain why he found that [a claimant] was not disabled at step three").

The parties disagree over whether the error was harmless. The Court concludes that it was not.

In *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004), the Tenth Circuit Court of Appeals defined its allowance of harmless error in the context of Social Security cases. The Court stated: "it nevertheless may be appropriate to supply a missing dispositive finding under the rubric of harmless error in the right exceptional circumstance, i.e., where, based on the material the ALJ did at least consider (just not properly), the court could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way."

7

The Court continued its discussion and expressed concern in applying harmless error, stating:

> Two considerations counsel a cautious, if not skeptical, reception to this idea. First, if too liberally embraced, it could obscure the important institutional boundary preserved by *Drapeau's* admonition that courts avoid usurping the administrative tribunal's responsibility to find the facts. Second, to the extent a harmless-error determination rests on legal or evidentiary matters not considered by the ALJ, it risks violating the general rule against post hoc justification of administrative action recognized in *SEC v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943) and its progeny.

*Id.*

In *Fischer-Ross v. Barnhart*, 431 F.3d 729, 734 (10th Cir. 2005), the Tenth Circuit applied *Allen* in the context of listed impairments, and held that an error at step three is harmless if "confirmed or unchallenged findings made elsewhere in the ALJ's decision confirm the step three determination under review." Thus, under *Allen* and *Fischer-Ross*, the ALJ's failure to discuss the capsule definition at step three may be harmless if the ALJ concluded elsewhere in the decision that Plaintiff had not satisfied this requirement.

At step four, the ALJ acknowledged Dr. Englander's examination of Ms. Lancaster, and discussed several of the psychologist's findings. (TR. 31). However, the ALJ neither mentioned Dr. Englander's diagnosis of mild mental retardation, nor the numeric values of the IQ scores, only referencing them as "low." (TR. 31). In his discussion, the ALJ suggested that the capsule definition had not been met when he stated:

> Despite her low IQ scores, the claimant has demonstrated significant ability in adaptive functioning, to-wit: she was self-employed mechanic since age 15, drives, cooks, and quit the 12th grade to work, not due to academic difficulties.

(TR. 31). If these findings conclusively prove that Plaintiff had not satisfied the capsule definition, then any error at step three would be harmless.

The Commissioner defends the ALJ's error as harmless, arguing a lack of evidence that Plaintiff met the capsule definition before age 22. But the ALJ did not reject the capsule definition based on such a finding. (TR. 31). Instead, the ALJ stated that Plaintiff had "demonstrated significant ability in adaptive functioning" based on her prior work as a mechanic and her daily activities. (TR. 31). To find that the capsule definition had not been met based on the timing of when Ms. Lancaster's mental impairment may have manifested would violate the two cautionary principles outlined in *Allen*—it would: (1) usurp the duty of the ALJ to have made that finding in the first instance and (2) require an impermissible *post-hoc* analysis. This the Court will not do.

Arguing against a harmless-error analysis, Ms. Lancaster contends: (1) the ALJ ignored Dr. Englander's diagnosis of mild mental retardation which provides conclusive evidence that the capsule definition had been met and (2) the ALJ improperly relied on the mechanic job and daily activities as evidence that she did not meet the capsule definition. Ms. Lancaster's first argument has merit, and the Court need not discuss the remaining contention.

According to Plaintiff, Dr. Englander's diagnosis of mild mental retardation was based on the definition of that impairment as listed in the *Diagnostic and Statistical*

9

*Manual of Mental Disorders*, 4th ed.; text revision, 2000 (DSM-IV-TR). Under that manual's definition, an individual meets the criteria for mild mental retardation if, before age 18, she has an IQ between 55 and 70 with "deficits or impairments in present adaptive functioning . . . in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." DSM-TR-IV. Therefore, Plaintiff argues that Dr. Englander's diagnosis provides conclusive proof that the capsule definition had been met, as it requires "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.,* . . . before age 22." Listing 12.05.

SSA regulations do not provide express criteria to determine the type or degree of deficit that the capsule definition requires. However, in 2002, the SSA stated that the capsule definition for Listing 12.05 "is consistent with, if not identical to, the definitions of [mental retardation] used by . . . [t]he four major professional organizations in the United States that deal with [mental retardation]." Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20,018, 20,022 (Apr. 24, 2002). The SSA further stated that determination of the capsule definition "allow[s] the use of any of the measurement methods recognized and endorsed by the professional organizations." *Id.*

Thus, Dr. Englander's diagnosis of mental retardation under the DSM-IV-TR *may* have provided conclusive evidence that Ms. Lancaster had met the capsule definition. On the other hand, the ALJ may have legitimately found otherwise by utilizing a

different, yet allowable, measurement method. But the Court cannot deem the step three errors as harmless by upholding the step four analysis because: (1) the ALJ ignored Dr. Englander's diagnosis and (2) the ALJ never stated which method he had used to gauge whether the capsule definition had been met. Had he identified a standard and discussed Dr. Englander's diagnosis, the Court would be able to determine whether the ALJ's analysis at step four was sufficient. But the ALJ fails to do either and the errors warrant remand.

The Tenth Circuit Court of Appeals reached the same conclusion in *Barnes v. Barnhart*, 116 Fed. Appx. 934 (10th Cir. Nov. 26, 2004) (unpublished op.). In *Barnes*, the plaintiff claimed that the ALJ had erred at step three in rejecting a finding of presumptive disability under Listing 12.05(C). The ALJ discussed Listing 12.05(C), but rejected the listing because the "adaptive functioning" portion of the capsule definition had not been met. *Id.* at 939. The ALJ stated:

> [The claimant's] impairment does not comply with the "capsule" definition paragraph of the Listing. It requires that her impairment be a "significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22).["] Assessment of her usual daily activities, her social life, and her educational life fails to reveal such *deficits in adaptive behavior.* The claimant maintains neatness and grooming, cares for her children. She went to school to the 10th grade and left to be married, not for educational reasons. The dissolution of her marriage was due to her husband's violation of his vows, and was not due to her own deficits.

*Id.*

On appeal, the Commissioner argued that the plaintiff had failed to show deficits in adaptive functioning. *Id.* at 940. But the Court found legal error in the ALJ's analysis of whether Plaintiff had met the capsule definition. The Court stated:

> The Commissioner publicly announced in April 2002 that there are at least four possible definitions of "deficits in adaptive functioning"-from the four major professional organizations dealing with mental retardation. . . . The ALJ in this case, however, essentially improvised his own definition for "deficits in adaptive functioning," . . . . Legally, his analysis does not comply with the Commissioner's (subsequent) direction that ALJs choose and apply one "of the measurement methods recognized and endorsed by [one of] the [four major] professional organizations" dealing with mental retardation. For these reasons, the case must be remanded, and the ALJ must identify which standard he has selected so that this court will be able to provide a meaningful review if there is a second appeal[.]

*Id.* at 940, 942 (internal citation omitted).

*Barnes v. Barnhart* is persuasive. Dr. Englander's diagnosis was based on a definition from one of the "four major professional organizations dealing with mental retardation." Like in *Barnes*, the ALJ here seemed to adopt his own standard for determining whether the capsule definition had been met. But in the absence of a recognized measurement method from the ALJ, it is impossible to determine whether Dr. Englander's diagnosis provided conclusive proof that the capsule definition had been met. As in *Barnes,* the ALJ there committed legal error and remand is warranted. *See Sanders v. Colvin*, 2015 WL 1357925 at 5 (W.D. Okla. Mar. 24, 2015) (unpublished op.) ("Because the ALJ appeared to use an *ad hoc* rather than a medically accepted standard for [assessing the capsule definition], and did not articulate the standard that was used, this Court is left in the same position as in *Barnes,* which is persuasive here, and must remand on that basis.").

## VI. CONCLUSION

The ALJ erred at step three by finding that the severity prong of Listing 12.05 had not been met. The Commissioner concedes the error in light of Dr. Englander's IQ test results. For two reasons, the Court is not persuaded that the error is harmless. First, the ALJ failed to articulate a recognized method of assessing the capsule definition. Second, the ALJ failed to discuss Dr. Englander's diagnosis of mild mental retardation which may have conclusively proved that the capsule definition had been met. On remand, the ALJ must: (1) choose a standard measurement method consistent with the SSA's directive, (2) evaluate whether Dr. Englander's diagnosis of mild mental retardation is sufficient to meet the capsule definition of Listing 12.05, and (3) make specific findings to support the step three determination.

## ORDER

Having reviewed the medical evidence of record, the transcript of the administrative hearing, the decision of the ALJ, and the pleadings and briefs of the parties, the undersigned magistrate judge **REVERSES** the Commissioner's decision and **REMANDS** for further administrative development.

**ENTERED** on February 19, 2016.

SHON T. ERWIN
UNITED STATES MAGISTRATE JUDGE